NITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NORMA WATTS, ADMINISTRATRIX OF THE ESTATE OF AQUAN SALMON | : | CIVIL ACTION NO. 3:00CV0681 (DJS) |
| | : | |
| VS. | : | |
| | : | |
| | : | |
| CITY OF HARTFORD; POLICE DEPARTMENT OF THE CITY OF HARTFORD; JOSEPH F. CROUGHWELL, Individually and in his Official Capacity as Chief of Police of the City of Hartford; OFFICER ROBERT C. ALLAN, Individually and in his Official Capacity As a Hartford Police Officer | : : : : : : : | APRIL 14, 2004 |

## MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION

### A.    Introduction.

The Court by Ruling and Order ("Ruling") dated March 31, 2004 granted Defendants' Motion for Summary Judgment on the "Monell" counts against the City and Chief Joseph Croughwell. Because of the critically important issues raised in this case to the citizens of Hartford, particularly those in the North End of the City, we respectfully request the Court to reconsider its Ruling in view of what we believe to be overlooked evidence of a long history of the use of excessive force by Hartford police officers that was the direct result of systemic failures of supervision and/or discipline

within the Hartford Police Department ("HPD"). No one failed more miserably to supervise and discipline officers of HPD during this time period than former Chief Croughwell.

Aquan Salmon, who was only 14 years old, unarmed, and African American, was shot to death by HPD officer Robert Allan on April 13, 1999, just hours after the Hartford Court of Common Council passed a Resolution declaring that there was "an immediate and looming crisis" in the HPD.[1] As a result of this fatal shooting by Allan, a white HPD officer, there was an immediate and angry public reaction by citizens of the North End of Hartford where the shooting occurred. Lead then by the leaders of the African American North End community, the Ministerial Alliance, Casa de Puerto Rico and former Deputy Mayor Nicholas Carbone,[2] the result was a revisiting by this Court of the 1973 Consent Decree in the case of Cintron v. Vaughn entered into between the City, HPD and the families of four victims of HPD shootings in 1969. In September 1999, the original plaintiffs to the Cintron action filed a motion for contempt alleging

---

[1] It was by virtue of this Resolution that the City commissioned the Buracker Comprehensive Study. The problems that persisted in HPD regarding discipline were common knowledge in the City. Defendant Joseph Croughwell was the Chief of HPD at the time of the Salmon shooting and for the period covered by the Buracker Report, which the Court found included evidence that suggested the "systemic problems" described in the 1994 Annual Report of the Civilian Police Review Board persisted. Those "systemic problems" included a complete failure by HPD and Croughwell to address properly complaints of excessive force.

[2] Carbone was on the Council when the Cintron Consent Decree was enacted.

MONIZ, COOPER & MCCANN, LLP • ATTORNEYS AT LAW
100 ALLYN STREET • HARTFORD, CT 06103 • (860) 278-0200 • FAX (860) 278-2212 • JURIS NO. 418370

that "noncompliance with the Consent Decree created an environment in the HPD that lead to the fatal shooting of 14-year-old Aquan Salmon on April 13, 1999." <u>Cintron v. Vaughn</u>, Plaintiff's Motion for Contempt 9/23/99.  This Consent Decree, which is a critical part of the Complaint in this case, addressed the use of firearms by HPD officers[3], as well as supervision and discipline regarding the use of excessive force.[4] The Consent Decree included a community policing policy, which lead to the formation in 1992 of the Civilian Police Review Board ("Review Board") to process civilian complaints against HPD officers.

This Court in its Ruling granting summary judgment on the Monell counts against the City and Chief Croughwell overlooked not only the significance of the Consent Decree on the issue of the use of excessive force by HPD officers, but also the critical importance of Chief Croughwell's failure to implement disciplinary and supervisory policies put in place pursuant to this landmark agreement by the City and HPD.  Chief Croughwell's deliberate failure to discipline officers can be inferred from

---

[3] HPD Policy and Procedure I-20 effective 11/20/88 states, "The use of firearms is <u>prohibited</u> … Against any individual the officer knows or reasonably believes to be under 16 years of age except to defend the officer or a third person form the use or imminent use of deadly physical force."

[4] The Court in its Ruling indicated that the plaintiff must "provide evidence from which a reasonable juror could conclude that, before the shooting at issue here, the City's response to citizen complaints of police brutality demonstrated a policy of negligent supervision that arose to the level of deliberate indifference to officers' use of deadly force in violation of constitutional rights." (Ruling at p. 11).  Our claim is based on the use of not only deadly force but also excessive force.

the 1994 Civilian Review Board Annual Report and the 1999 Buracker Report to have
endured from the time he became chief in 1993 until the date on which Robert Allan
shot and killed Aquan Salmon. That failure by Chief Croughwell and HPD amounted
to a custom or policy of deliberate indifference toward supervising and disciplining
officers, not only in the use of deadly force, but also in the use of excessive force in
general. Finally, the Court overlooked specific, direct evidence regarding the Chief's
failure to investigate <u>any</u> of the three citizens' complaints against Officer Allan
himself.[5] That coupled with the CPRB findings regarding police attitudes toward
complainants and delays by Chief Croughwell certainly permit an inference to be drawn
that the complaints withdrawn against Officer Allan were not done so for lack of merit.[6]

     As we represented to this Court in our motion to amend the complaint, which
permitted the City and Chief to be brought back into this case: "Based upon the

---

[5] The Defendants attempt to explain away the Lt. Lopez memo by claiming that two types of internal files existed – IAD and I-Files, and that the latter were initiated by the Chief if he became aware of conduct that could result in disciplinary action, whether or not a citizen filed a complaint. The inference that must be drawn from that explanation is that the Chief upon learning of misconduct of an officer, e.g., putting a gun to the head of a citizen during a motor vehicle stop, should initiate an investigation under the I-Files, with or without a citizen complaint. That failure is particularly relevant in view of the manner in which the department and Chief Croughwell discouraged complaints under the IAD system.

[6] The Review Board Report documents outrageous conduct by HPD and Chief Croughwell toward citizens who dared to file complaints against HPD officers, including threatening and jeering complainants during hearings on complaints, refusing to cooperate, giving officers the contents of the complaints in advance in order to allow them to tailor their responses, and failing blatantly to respond to the Review Board regarding civilian complaints within the time prescribed by ordinance.

critically important issues raised in this most recent fatal police shooting involving the

Hartford Police Department and Chief Croughwell, both to the family of Aquan Salmon

and the citizens of the City of Hartford, justice requires that the proposed amendment to

the Complaint be allowed.  A jury should be permitted to decide whether HPD and

Croughwell's conduct in continually sabotaging the carefully-considered protections put

into place following the police shootings in 1969-70 violated Aquan Salmon's civil

rights and/or the Cintron Consent Decree."  We have since presented documentary

evidence, which, at the very least, details a custom or policy on the part of Chief

Croughwell and HPD of refusing to address citizens' complaints of police misconduct

that included the use of excessive force.  The issues raised in this case against the City

and Chief Croughwell are rooted in the 1973 Consent Decree that was intended to put

into place a system of supervision and discipline that would prevent HPD officers from

violating the civil rights of citizens, particularly young African American and Hispanic

citizens like Aquan Salmon.  In this regard, the importance of the claim against the City

and Chief Croughwell cannot be understated.  As we stated to this Court in our

memorandum opposing Defendants' objection to the motion to amend the complaint by

bringing the City and Chief Croughwell back into the case, the case of <u>Amato v. City of</u>

<u>Saratoga Springs</u>, 170 F.3d 311 (1999) says it best:

> Perhaps even more important to society [than the conduct of an individual officer] however, is the ability to hold a municipality accountable where official policy or custom has resulted in the deprivation of constitutional rights. <u>A judgment against a municipality not only holds that entity responsible for its actions and inactions, but also can encourage the municipality to reform the patterns and practices that led to constitutional violations, as well as alert the municipality and its citizenry to the issue. In short, a finding against officers in their individual capacities does not serve all the purposes of, and is not the equivalent of, a judgment against the municipality.</u> Amato v City of Saratoga Springs, 170 F.3d 311 (1999). (Emphasis added.)

**B.    The Court's Ruling and Order**

The Court in its Ruling on the Monell claims determined there was no triable issue of fact as to the failure-to-screen claim, but found that the "failure-to-supervise claim presents a closer question." (Ruling at 6-7). We seek reconsideration only on the failure-to-supervise claim.[7]

The Court in granting summary judgment stated that Plaintiff's failure-to-supervise claim was based upon evidentiary material from (1) the 1994 Annual Report of the CPRB; (2) the Buracker Report; (3) a statement by civilian members of the Firearm Discharge Review Board; and (4) IAD complaints against Allan.[8] The Court

---

[7] While the Ruling refers to this as a failure-to-supervise claim, as the Court properly noted, it encompasses both the failure-to-supervise and failure-to-discipline claims. The evidence we emphasize herein and in earlier filings, however, comes under the traditional claim of failing to discipline officers for improper, and at times, unconstitutional conduct.

accepted as admissible in substantial part the 1994 Report and "consulted" the Buracker

Report to determine what facts raised therein could be proved through competent

evidence.[9]  The statement by members of the FDRB were not referenced at all by the

Court in summing up the Plaintiff's submissions of evidence[10], and only one of the

three citizens' complaints against Allan was credited by the Court.[11]

      The Court, viewing the submissions most favorable to the Plaintiff, concluded

that (1) "the City and Croughwell failed to implement and maintain an adequate system

for addressing citizen complaints against the City's police officers;" (2) "Croughwell's

handling of citizen complaints was inadequate, <u>at least as of the time the Report was

published</u>" [emphasis added]; (3) the systemic problems described in the Report of the

---

[8] The Court apparently did not consider the Cintron Consent Decree or the HPD Policies and Procedures enacted to assure compliance with the Decree including, I-20 and I-22 that created the Firearms Discharge Review Board.

[9] We would represent that evidence would be produced regarding the continued blatant disregard for disciplining officers charged with using excessive force from the time that Chief Croughwell became chief until the shooting of Aquan Salmon.

[10] This statement included references to the action by this Court in 1999 and 2000 concerning contempt proceedings against the City for Chief Croughwell's conduct that eviscerated the function of the Firearms Review Board, as well as comments that the result of Chief Croughwell's and HPD's conduct toward the Review Board's investigations led to complaints being dropped, including those against Officer Allan.

[11] The 1994 Report of the Review Board details actions by the Chief and HPD it believed caused citizens to withdraw complaints, as was the case with two of the complaints against Allan.  If the Review Board is correct, i.e., that complainants withdrew complaints because of the conduct of HPD officers and Chief Croughwell's refusal to cooperate, then the Court has rewarded the Chief and HPD for their intolerable conduct by accepting these withdrawals as a finding on the merits of the underlying complaints.

Review Board persisted; and (4) "the failure to accurately classify the citizen complaint against Allan for improper use of his gun could be … evidence of a deliberate failure to deal with the complaint in an appropriate manner."

  Based upon its view of Plaintiff's submissions, the Court concluded that summary judgment should be granted because the evidence produced must permit a reasonable jury to conclude that (1) "the City's response to <u>citizen complaints</u> of police brutality demonstrated a policy of negligent supervision that rose to the level of deliberate indifference to officers' use of <u>deadly force</u> in violation of constitutional rights; (2) this repeated <u>failure to discipline other officers</u> was closely related to and actually caused Allan's shooting of Plaintiff's decedent." (emphasis added.)  The court then citing excessive force cases involving police misconduct stated that "plaintiff must provide evidence that <u>this repeated failure to discipline other</u> officers was closely related to and actually caused Allan's shooting of plaintiff's decedent." (Emphasis added.)  The Court stating that "plaintiff relies on an alleged pattern and practice of failing to discipline <u>officers in general</u>" noted that these cases relied upon by Plaintiff "predate the incident at issue here by four to five years," and that the Buracker Report makes no reference to "unconstitutional conduct or the department's handling of such complaints." (Ruling at pp. 12-13).  Finally, the Court in addressing the three

complaints against Allan states that "to the extent that <u>one</u> complaint lodged and subsequently withdrawn against Allan was improperly classified as 'bad judgment' rather than excessive force, a <u>single incident</u> is insufficient to establish a policy of inadequate discipline.'" (Citing <u>Turpin v. Mailet,</u> 619 F.2d 196, 202 (2d Cir. 1980).

**C.    The Court in Granting Summary Judgment Overlooked Critical Evidence Regarding the City and Chief Croughwell's Deliberate Disregard for Disciplining Officers for the Use of Excessive Force, Including Deadly Force.**

The Court in granting summary judgment as to the City and Chief Croughwell overlooked critical evidence that establishes a custom or policy of failing to discipline Officers of HPD from at least 1993 until the shooting at issue here that rose to a level of deliberate indifference. The Court also concluded that the "plaintiff relies on an alleged pattern and practice of failing to discipline officers in general" and found that while we provided evidence of such a practice, the "incidents predate the incident at issue here by four to five years." (Ruling at p. 12.) While we do rely on evidence of a pattern and practice of failing to discipline officers in general, the documentary evidence and favorable inferences which must be drawn from that evidence establish a pattern and practice of failing to discipline officers that endured throughout Chief Croughwell's

term as head of HPD.  Additionally, we presented evidence of a specific failure to discipline Officer Allan himself.

The Second Circuit has ruled consistently in police misconduct cases that a city may be held liable under Section 1983 if it is "knowingly and deliberately indifferent to the possibility that its police officers were wont to use excessive force and that this indifference was demonstrated by [the City's] failure…to exercise reasonable care in investigating claims of police brutality in order to supervise the officers in the proper use of force." Thomas v. Roach, 165 F.3d 137, 145 (2d Cir. 1999), quoting from Carnegie v. Miller, 811 F. Supp. 907, 912 (S.D.N.Y. 1993).  The proof required is that there is a pattern and practice in general by the municipality for failing to discipline or supervise officers.  See Walker v. City of New York, 974 F.2d 293, 296 (2d Cir. 1992).  While proof of a failure as to the officer in question is helpful in establishing that the failure to discipline "was closely related to and actually caused" the misconduct in question, it is not essential to have such proof to link the pattern or practice to the unconstitutional conduct at issue. Id.

In this case, however, we do in fact present evidence of a failure to investigate and/or discipline Officer Allan for alleged use of excessive force on three separate occasions.  Even if the Court were to accept only one of those alleged incidents as

evidence, its ruling that "a single incident is insufficient to establish a policy of inadequate discipline," overlooks the fact that this evidence as to Allan was submitted in addition to the evidence as to the lack of proper supervision and discipline of officers in general. (Ruling at p. 13.)  The Court in this regard relied on <u>Turpin v. Mailet,</u> 619 F.2d 196 (2d Cir. 1980), which addressed an entirely different situation in which the only evidence of a pattern or practice arose "out of a single prior episode and its aftermath." <u>Id.</u> at 202.  That is not our case.

We address below concisely the evidence that the Court overlooked, which we believe establishes a material question of fact on the Monell counts.

1.    <u>Cintron v. Vaughn Consent Decree</u>

The Court overlooked in its entirety the landmark <u>Cintron v. Vaughn</u> Consent Decree, which was entered into by the City and HPD following the shootings of several young black and Hispanic citizens.  The Consent Decree established a Firearms Discharge Review Board that required an  investigation into all discharges of firearms by HPD officers.  The Consent Decree also established various procedures for the use of force in general.  One of the procedures that was put into place pursuant to the Consent Decree was Policy and Procedure 1-20 in 1988 (See attached) by then Chief Bernard Sullivan, which stated that

"the use of firearms is <u>prohibited:</u> ...2. Against any individual the officer knows or reasonably believes to be under 16 years of age except to defend the officer or a third person from the use or imminent use of deadly physical force."

Chief Croughwell on March 21, 1996 amended Policy and Procedure 1-21 (See attached) by eliminating the role of the Firearms Discharge Review Board, and essentially abdicated HPD's role in investigating shootings causing physical injuries or death to the State's Attorney's office. (See 1-21a attached.)

Following the shooting in this case, a group of citizens from the North End of Hartford along with the original plaintiffs in the <u>Cintron</u> case sought a contempt ruling against the City for its failure to comply with the Consent Decree, including the action by Chief Croughwell in amending Policy 1-21. In their contempt motion, the plaintiffs alleged that "noncompliance with the Consent Decree created an environment in the HPD that lead to the fatal shooting of 14-year-old Aquan Salmon on April 13, 1999." <u>Cintron, supra.</u>  This Court in ruling on an Application to Intervene filed by the Hartford Police Union and Robert Allan himself details the history of the Firearms Discharge Review Board and its purposes. (See attached Ruling on Application to Intervene dated 3/15/00.)  While the Court did not have to rule on the contempt motion because of an agreement reached among the parties, it stated with regard to the changes made by Chief Croughwell in 1996 that "these two changes -- deferral of the Board's

investigation and possible unilateral reinstatement of the officer – strip the Board of much of its authority contemplated under the consent decree." The Court then in a footnote states that while it "need not, for the purpose of resolving [the Motion to Intervene] find the Defendants [i.e., the City] in contempt of the consent decree based on these two changes," the "1986 Order and the 1996 Amendment appear to violate the spirit, if not the letter, of the consent decree by gutting the Board's power to conduct a meaningful review."

This evidence regarding Chief Croughwell's actions in precluding investigations by citizens into the use of firearms is consistent with the refusals on his part to comply with the Civilian Review Board's investigations of police misconduct from the beginning of his tenure as chief.

2.    1994 Annual Report of the Civilian Police Review Board

While the Court did accept as admissible the 1994 Review Board Report, some key points of the Report were overlooked. A critical finding of the Report was that the purpose of the Review Board in the first place was to overcome "any suspicions of cover-up or less-than-adequate responses to complaints." (Report at p.1.) By ordinance the Chief of Police was required to refer cases to the Board within two weeks of completion by IAD, which Chief Croughwell violated on a regular basis. The Report

indicated that Chief Croughwell delayed markedly or failed to respond at all regarding ordinance mandated data, to such an extent that the Report indicated that the "data by IAD is woefully incomplete." The Report noted that "Chief Croughwell has consistently refused to provide specific disciplinary outcome data despite Corporation Counsel findings which support the release of such data."

The most critical aspect of the Report as it relates to claims being withdrawn is that complainants were not only harassed by HPD officers, but also told by IAD investigators that their complaints were not believable. Cases were being heard 1 to 1 ½ years after they were filed. The Report attributes the delays to Chief Croughwell's resistance. (Report at p.8.) In one case cited in the Report, former Chief Jessie Campbell sustained a charge of excessive force but resigned before any disciplinary action was taken. Campbell was replaced by Chief Croughwell who failed to report any disciplinary action against the officer. (Report at p.11.)

Most notably on the issue of Chief Croughwell's failure to supervise and discipline HPD officers, the Report found that "the complainants specifically and the public in general realize that the Chief either cannot or will not demand restraint and civility from individual police officers." (Report at p. 12.) As a result of the Chief's failures in this regard, HPD officers consistently refused to participate in hearings of the

Board and jeered and insulted complainants and the Board, including threatening citizens and Board members at hearings. (Report at p. 13.) What more convincing evidence could be produced to demonstrate the Chief's failure to supervise and/or discipline his officers? And as reported in the Buracker Report, these systemic problems continued up to the date of the shooting at issue herein.[12]

3.    The Buracker Report

Accepting the Court's Ruling as to the admissibility of the Buracker Report for purposes of this motion only, we nonetheless believe that the critical finding of the Report would lead to a conclusion that evidence would be forthcoming on the issue of the continued failure to discipline officers by Chief Croughwell. The Buracker Report as noted by the Court "suggests that there were deficiencies in the citizen complaint process and a perceived lack of discipline." (Ruling at p. 13.) Taken together with the damning findings of the Board Report as to Chief Croughwell's failures regarding discipline, the inevitable conclusion is that nothing had changed from the date of the Board Report up to the time that Salmon was shot and killed.

4.    Statement by Civilian Members of the Firearms Discharge Board of Inquiry.

---

[12] On the evening of April 12, 1999 when the resolution was passed to the management study, the widespread problems of lack of discipline and rouge police officers within HPD had been widely reported in the media.

MONIZ, COOPER & MCCANN, LLP • ATTORNEYS AT LAW
100 ALLYN STREET • HARTFORD, CT 06103 • (860) 278-0200 • FAX (860) 278-2212 • JURIS NO. 418370

The Court without stating so appears to accept Defendants' claim that this Statement is in admissible in its entirety. We believe that certain portions of the Statement may be used by the Court to determine whether evidence regarding Officer Allan's IAD file would support our claims herein. For example, the Statement refers to a statistic that since January 1999, 80-100 citizen complaints remained in existence. That is consistent with the evidence previously cited regarding Chief Croughwell's failure to investigate complaints against HPD officers.

     5.     <u>Officer Robert Allan's IAD Files</u>

The Court overlooked the issues raised by the Review Board regarding the consequences of Chief Croughwell's failure to investigate and discipline officers for misconduct. The Court impliedly assumed that the complaints that were withdrawn were done so because they lacked merit. We think the evidence presents a strong inference that complainants were harassed into withdrawing complaints because of the conduct of investigators, officers at hearings and the Chief's failure to take the complaint process seriously. That inference must be made in our favor for purposes of summary judgment.

Finally, the one complaint against Allan which the Court did address exhibited extremely violent behavior by Allan. Categorizing this conduct as "poor judgment"

demeans the entire purpose of the Civilian Review Board and exhibits a departmental

attitude of disregarding investigations and discipline of police use of excessive force.


**D.**     **Conclusion**

We respectfully request that the Court reconsider its Ruling in view of the issues

we have raised herein as to matters that the Court overlooked.  We have stated

previously, as has this Court, that this case presents a critically important issue to the

citizens of Hartford.  While this action is being brought on behalf of the Estate of

Aquan Salmon, the issues at stake herein go beyond the activities of Robert Allan and

Aquan Salmon on the night and early morning hours of April 12 and 13, 1999.  To limit

the case to the actions of Robert Allan would allow Chief Croughwell and the City to

get off the hook despite the substantial evidence of a long term policy and practice of

failing to supervise and discipline their officers in the use of excessive force.

PLAINTIFF

By _____

Joseph A. Moniz (ct04316)
Moniz, Cooper & McCann, LLP
100 Allyn Street
Hartford, CT  06103
Tel. (860) 278-0200
Her Attorneys

And

Nicholas P. Cardwell, Esq.
Cardwell, Cardwell & Smoragiewicz
108 Oak Street
Hartford, CT 06106
Her Attorneys

## **CERTIFICATION**

THIS IS TO CERTIFY that a copy of the foregoing was mailed, postage prepaid, this date to:

Nicholas P. Cardwell, Esq.
Cardwell, Cardwell & Smoragiewicz
108 Oak Street
Hartford, CT 06106

Eric P. Daigle, Esq.
Halloran & Sage LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103

Joseph A. Moniz